IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:21-CT-03296-M

| | |
|---|---|
| EDWARD EARL BROWN, Jr., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) ORDER |
| | ) |
| JOHN HERRING, et al., | ) |
| | ) |
| Defendants. | ) |

This cause is before the court on defendants' pending motion for summary judgment. Mot. [D.E. 70]. For the reasons discussed below, the court grants the motion.

Relevant Procedural History:

On September 28, 2021, Edward Earl Brown, Jr. ("plaintiff"), a state inmate proceeding without prepayment of fees, filed *pro se* an unverified complaint under 42 U.S.C. § 1983. See [D.E. 1, 2, 8]. Plaintiff generally alleges violations of his Eighth and Fourteenth Amendment rights at Maury C.I. on March 22, April 20, and July 25, 2019. See Compl. [D.E. 1] at 3–5. Plaintiff names as defendants: Warden Herring ("Herring"); Captain Roundtree ("Roundtree");[1] Lieutenant Horner ("Horner"); Sergeant Hetrick ("Hetrick"); Security Threat Group ("SRG") Officer Coley ("Coley"); Sergeant Joyner ("Joyner"); Sergeant Hutchinson ("Hutchinson");[2] Unit Manager Harper ("Harper"); Assistant Unit Manager Dudley ("Dudley"); and Officer Ravenell ("Ravenell"). See id. at 1. Plaintiff seeks, *inter alia*, compensatory damages. Id. at 6.

---

[1] This defendant is variously identified as Roundtree/Coley, Compl. [D.E. 1] at 1, Roundtree, see [D.E. 11-1] at 1, and Coley, see Defs.' Mem [D.E. 71] at 1, n.1. The court will use the name "Roundtree" for this defendant.

[2] Although identified by plaintiff as Officer Hudgeson, see Compl. [D.E. 1] at 1, this defendant is properly identified as Sergeant Hutchinson, see Answer [D.E. 25]. The court will use the name "Hutchinson" for this defendant.

On May 20, 2022, the court conducted its initial review, allowed the action to proceed as to plaintiff's failure-to-protect claims, but dismissed his remaining claims. See Order [D.E. 13].

On September 19, 2022, defendants answered the complaint. Answer [D.E. 25].

On September 22, 2022, the court entered a Scheduling Order. Order [D.E. 26].

On November 17, 2022, plaintiff moved for appointment of counsel. Mot. [D.E. 38].

On November 21, 2022, the court denied the motion to appoint counsel. Order [D.E. 39].

On January 30, 2023, plaintiff moved to compel discovery. Mot. [D.E. 42].

On February 3, 2023, plaintiff moved for appointment of counsel. Mot. [D.E. 44].

On February 8, 2023, plaintiff, *inter alia*, moved for an extension of time to file an amended complaint and for leave to file an amended complaint. Mot. [D.E. 45]; Mot. [D.E. 46].

On February 14, 2023, the court denied without prejudice plaintiff's February 3, 2023, motion to appoint counsel, granted in part plaintiff's February 8, 2023, motion to extend time to file an amended complaint, and stayed the dispositive motions deadline. Order [D.E. 49].

On March 17, 2023, the court denied plaintiff's motion for leave to file an amended complaint and dismissed without prejudice Horner as a defendant. Order [D.E. 51].

On March 22, 2023, plaintiff again moved to compel discovery. Mot. [D.E. 52].

On April 21, 2023, plaintiff filed a motion seeking subpoenas for trial. Mot. [D.E. 54].

On May 5, 2023, the court denied as premature the motion for subpoenas, denied the first motion to compel discovery, denied in part the second motion to compel discovery, and directed defendants to respond to plaintiff's production request for surveillance video and photographs related to the alleged April 20, 2019, incident at Maury C.I. Order [D.E. 55].

On May 17, 2023, plaintiff again moved to appoint counsel. Mot. [D.E. 56].

On May 23, 2023, defendants responded to the court's May 5, 2023, order. [D.E. 57].

2

On May 25, 2023, the court denied without prejudice plaintiff's May 17, 2023, motion to appoint counsel and lifted the prior stay of the deadline for dispositive motions. Order [D.E. 58].

On September 15, 2023, plaintiff again moved to appoint counsel. Mot. [D.E. 67].

On September 22, 2023, defendants moved for summary judgment, Mot. [D.E. 70], and filed a memorandum in support [D.E. 71], a statement of material facts [D.E. 72], a proposed sealed document [D.E. 73], a motion to seal [D.E. 74], and a motion to manually file video exhibits, Mot. [D.E. 75]. Pursuant to Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir. 1975) (per curiam) ("Roseboro"), the court notified plaintiff about the motion for summary judgment, the response deadline, and the consequences of failing to respond. [D.E. 76].

On October 19, 2023, plaintiff filed a self-styled "request for modification or exemption of defendant's summary judgment [sic]." Mot. [D.E. 78].

On October 20, 2023, the court denied the motion to appoint counsel, granted defendants' motion to seal, granted defendants' motion to manually file exhibits, denied in part plaintiff's motion seeking an exemption from responding to the motion for summary judgment, but granted the motion to the extent he sought leave to file his response with the court for electronic service on defendants, and allowed plaintiff an extension of time to file a response. See Order [D.E. 79].

On October 23, 2033, plaintiff filed a response with an opposing statement of facts, an appendix citing exhibits, and an exhibit as to prison recreation. See Pl.'s Resp. [D.E. 80].

### Statement of Facts:

Plaintiff arrived at Maury C.I. on February 22, 2019. Defs.' Stmt. Mat. Facts. [D.E. 72] at ¶15. At Maury C.I., there are different units and dorms, and, in the Blue Unit, six dorms (a.k.a. "Pods" or "blocks") are labeled A, B, C, D, E, and F. Id. at ¶¶9–10, 24. The record generally supports defendants' statement that Blue Unit inmates from other dorms "do not have

3

recreation together." Compare id. at ¶¶11–12, and Pl.'s Resp. Attach. [D.E. 80-2] at 1–2 (noting Green/Blue Unit A, B, and C offenders utilize the J7B Courtyard, but Green/Blue Unit D, E, and F offenders utilize the J28B Courtyard, and stating, "offenders will be permitted to access the yard when their assigned Pod (Green and Blue) is called"), with Pl.'s Stmt. Mat. Facts [D.E. 80] at ¶¶11–12 (querying whether Blue Unit inmates have recreation "with inmates from the other two dorms [sic]").

Statewide prison policy allows inmates to request protective custody which "prompts an evaluation of whether 'the offenders request is legitimate[,] and that restrictive housing is necessary for the continued well-being of the offender.'" Defs.' Stmt. Mat. Facts. [D.E. 72] at ¶¶13–14; see also Defs.' App., Ex. 1S, [D.E. 73-1] at 172–75 (outlining Protective Control ("PCON") housing policies); but see Pl.'s Stmt. Mat. Facts [D.E. 80] at ¶¶13–14 (querying whether his protective custody requests were "deliberately denied" and if "concerns of the dangers of his 'well-being' . . . were not legitimate enough to qualify for protection from harm").

On March 22, 2019, plaintiff was housed in Blue Unit F Dorm when he had a brief physical altercation with four inmates. Id. at ¶¶16–17; see Pl.'s Stmt. Mat. Fact [D.E. 80] at ¶¶16–17 (stating he "defended himself" to get away). The video exhibit of this altercation generally aligns with the incident report. See Defs.' App., Ex. 1E, [D.E. 73-1] at 61 (Mar. 22, 2019, video showing four inmates gathering at plaintiff's cell, a confrontation, plaintiff running away and fleeing downstairs, and officers promptly responding); see also id., Ex. 1G [D.E. 73-1] at 72–73 (incident report stating, inter alia: on Mar. 22, 2019, circa 8:30 a.m., a "code blue" was called for an altercation between plaintiff and Offender Canady; plaintiff reported in an interview he was sleeping, he saw the offenders entering his cell, and he ran out of his cell to get away; Roundtree viewed the video footage and observed that offenders Canady, Patterson, Anderson,

4

and Artis were standing at plaintiff's cell and arguing with him, Canady and Artis assaulted plaintiff, and that Canady, Patterson, and Anderson were in an unauthorized location; and, in conclusion, that the video footage supports the report made by staff and that staff carried out their duties in accordance with established procedures).

Plaintiff queries whether he was denied immediate post-incident medical attention or medical treatment in the following weeks, see Pl.'s Stmt. Mat. Facts [D.E. 80] at ¶¶18–20, but contemporaneous medical records support defendants' statements that plaintiff refused medical attention despite various treatment opportunities, Defs.' Stmt. Mat. Facts. [D.E. 72] at ¶¶18–20, see Defs.' App., Ex. 1C, [D.E. 73-1] at 11 (Mar. 22, 2019, nurse clinical encounter noting plaintiff refused medical screening for Restrictive Housing Unit, and commenting, "no sign of injury or pain"); id. at 12 (Mar. 29, 2019, nurse clinical encounter at Restrictive Housing Unit noting, "offender became argumentative when told there is no follow up from over one month ago at another camp, refused sick call earlier this month, refused sick call in Jan at last camp. Offender refused sick call today, stated 'I will try another day.'"); id. at 13 (Apr. 4, 2019, missed appointment, stating plaintiff "refused to attend session" and indicated, "I'm good"); see also id. at 85 (Mar. 22, 2019, witness statement by Nurse Martin, stating that plaintiff "refused medical screening for placement in the RHU [Restrictive Housing Unit]" and "no pain or injury noted").

Plaintiff was charged with a prison disciplinary infraction pursuant to the March 22, 2019, incident, and these charges subsequently were dismissed, but the other four inmates were charged and convicted of infractions including attempted assault, unauthorized location, and assault. Defs.' Stmt. Mat. Facts. [D.E. 72] at ¶¶21–22. Plaintiff and the other four inmates all were placed in restrictive housing after this incident, but plaintiff submitted a March 25, 2019, grievance seeking to be "let off of segregation immediately." Id. at ¶23.

5

On April 4, 2019, plaintiff was released from restrictive housing and reassigned to Blue Unit C Dorm, but he was not placed in the same dorm as any of the other four inmates involved in the March 22, 2019, incident. Id. at ¶¶23–26; but see Pl.'s Stmt. Mat. Facts [D.E. 80] at ¶¶25–26 (querying whether the four inmates involved in the Mar. 22, 2019, incident "spread word that plaintiff snitched on them" to get released to regular population, and whether plaintiff was "blamed for the four inmates['] long-term segregation sentence[s]").

On April 19, 2019, plaintiff was moved from C Dorm to B Dorm in the Blue Unit. Defs.' Stmt. Mat. Facts. [D.E. 72] at ¶27; see Pl.'s Stmt. Mat. Facts [D.E. 80] at ¶27 (querying whether Hetrick and Hutchinson moved him "due to plaintiff and other inmates from C Pod giving notice of the danger to [his] wellbeing on the (Blue Unit) for being labeled a 'snitch.'"); but see Hetrick's Answers to Pl.'s 1st Set of Interrogatories, [D.E. 48-1] at 13 (responding to plaintiff's queries: 5) whether Hetrick was present on April 19, 2019, when plaintiff stated to Hutchinson "concerns of his safety being placed in Blue Unit (A-B-C) side due to the assault that occurred on the date of March 22, 2019," "I do not currently recall this taking place"; and 6) whether Hetrick agreed with Hutchison to instead move plaintiff from Blue Unit C-pod to B-pod, "I do not currently recall this happening" and "had an inmate stated to [Hetrick] that he feared for his safety, [Hetrick] would have place the inmate in protective custody"); Hutchinson's Answers to Pl.'s 1st Set of Interrogatories, [D.E. 48-1] at 66 (responding to plaintiff's queries: 6) whether, on April 19, 2019, plaintiff notified Hutchinson "that plaintiff was receiving threats of his wellbeing by inmates within Blue Unit C-pod as well as the Blue Unit in whole that [there] would be [an] attack on the plaintiff if he were not moved," "I have no knowledge of any threats made"; and 7) whether Hutchison reassigned plaintiff from Blue Unit C-pod to B-pod on April 19, 2019, "instead of assigning the plaintiff to a different unit," "To the best of my knowledge, no").

6

On April 20, 2019, circa 4:24 p.m., plaintiff was involved in a physical altercation with a different inmate. Defs.' Stmt. Mat. Facts. [D.E. 72] at ¶29; see Pl.'s Stmt. Mat. Facts [D.E. 80] at ¶29 (querying whether he was stabbed several times in a "non-mutual altercation" by an inmate in an unauthorized area). The video exhibit generally aligns with the incident report. See Defs.' App., Ex. 1L, [D.E. 73-1] at 109 (Apr. 20, 2019, video showing: inmates gathered watching television; an offender attacking plaintiff from behind with blows to the head and back; plaintiff fleeing around tables and a staircase; the attacker giving chase and continuing to strike plaintiff; plaintiff falling down while the attacker straddles him and continues striking his head and back; plaintiff standing up between the attacker's legs and punching the attacker; and, approximately 20-seconds after the attack began, officers responding, deploying pepper spray, restoring order, and placing both offenders in restraints); id., Ex. 1Q [D.E. 73-1] at 163–68 (Apr. 20, 2019, incident report stating, *inter alia*: Blue Unit Control Officer Williams called a Code 4 after observing plaintiff and Offender Stovall in a physical altercation; O.C. pepper spray was used by staff; both offenders were close custody assigned to regular population; in a statement, plaintiff stated "he was watching T.V. in the Blue Unit B-pod when an unknown offenders [sic] came up from behind hitting him," plaintiff "never threw a punch and the video will show it," and "this is his second attack within 30 days"; staff variously reported that the offenders were observed in a physical altercation, the offenders separated after pepper spray was deployed, and that the offenders were handcuffed, escorted to restrictive housing, and observed for an hour after decontamination; the investigator determined both offenders were medically screened, that the video footage supports the staff reports, that staff "carried out their duties in accordance with established procedure," that "the amount of force used was reasonably applied to achieve the correctional objective," and that "proper decontamination procedures were utilized.").

7

Contemporaneous records support defendants' statements that a nurse evaluated plaintiff after the incident, noting he denied pain and did not appear in distress. Defs.' Stmt. Mat. Facts. [D.E. 72] at ¶¶30–34; see Defs.' App., Ex. 1C, [D.E. 73-1] at 14–16 (Apr. 20, 2019, clinical encounter, noting: as "subjective complaint," "I was watching T.V. I was just scratched"; on exam, visible injuries including superficial abrasions behind his right ear and on his right knee, the latter treated with a Band-Aid, and a "1x.3x.2 cm puncture type wound noted to the middle of the back" that was treated with "Steri-strips," and, noting the puncture wound was cleansed with normal saline, and noting plaintiff was pepper sprayed but decontaminated in the shower prior to arrival; as "assessment," "no significant findings/no apparent distress"; as "disposition," "follow-up at sick call as needed"; as other, "Inmate is medically screened and cleared for placement on the restrictive housing unit following a use of force with OC spray"; and, as "patient educational topics," counseling and a handout on wound care was provided); but see Pl.'s Stmt. Mat. Facts [D.E. 80] at ¶¶31–34 (querying as to the records' accuracy and whether he complained of pain).

Contemporaneous records also generally support defendants' statements as to plaintiff's follow-up treatment after this April 20, 2019, incident. See Defs.' Stmt. Mat. Facts. [D.E. 72] at ¶¶35–39 (stating: plaintiff did not voice any complaints about his physical or mental health on April 29th, May 10th, or May 20th; on May 23, 2019, plaintiff complained about the injuries suffered on April 20, 2019, when he stated that he was "stabbed in [his] spine and [he was] having a lot of pain right now," and he was given ibuprofen; and he has "a history of back pain related to a gunshot wound"); Defs.' App., Ex. 1C, [D.E. 73-1] at 17–18 (Apr. 29, 2019, progress note discussing psychiatric issues, but not addressing physical pain or injuries); id. at 19–20 (May 10, 2019, Restrictive Housing evaluation noting, inter alia: plaintiff at "elevated risk of violence due to . . . pending infraction for fighting," but not addressing physical pain or injuries);

8

id. at 21 (May 20, 2019, Restrictive Housing assessment noting plaintiff's interview, finding no significant mental health issues, and noting he appeared to be adjusting well); id. at 22–24 (May 23, 2019, clinical encounter noting: as subjective complaint, "I was stabbed in my spine and I am having a lot of pain right now"; observing, as a symptom, "gait abnormality"; observing, on exam, "offender states that he is experiencing pain and 'tingling' from an old puncture wound that happened on 4/20/19 to his upper, middle back"; as assessment, "comfort impaired r/t old puncture wound to back"; prescribing ibuprofen; as to "disposition," "follow-up at sick call as needed"; and, in "other," "offender treated per nursing protocol for back pain" and "given 5 day supply of ibuprofen and encouraged to follow up at sick call if needed"); id. at 25–26 (June 11, 2019, restrictive housing evaluation noting, *inter alia*: plaintiff at "elevated risk of violence due to . . . a threat to harm staff infraction for which he was found guilty," but not addressing physical pain or injuries); id. at 32–34 (July 18, 2019, Restrictive Housing Unit sick call noting: as chief complaint, "back pain"; as subjective complaint, "My back is really hurting where I go shot [sic]. My muscles are tensed[,] and I need more pain medication"; as "history of trauma," a 2016 "gunshot wound to his lower back"; for onset and duration, "1-5 years"; as exacerbating factors, "lying on the thin mattress"; as relieving factors, "strong pain medication"; finding normal musculoskeletal exam with full range of motion; as assessment, "impaired comfort related to chronic back pain from a previous gunshot wound to the lower back. He presents to sick call this a.m. requesting stronger pain medication to relieve the pain. Denies participating in lower back exercises to release tight muscles that may be contributing to his pain. He was adamant about receiving Ultram for pain. Ibuprofen and Tylenol was offered, but he refused. Instructed to utilize lower back exercises, take warm showers[,] and take medication already provided by his provider"; and, as to "disposition," "follow-up at sick call as needed"); but see

9

Pl.'s Stmt. Mat. Facts [D.E. 80] at ¶¶35–39 (querying: whether, on April 29th, May 10th, or May 20th, he was "in too much pain and [was] trying to recover from stabbing injuries to complain of pain [sic]"; whether he complained about stabbing injuries; whether his requests for outside treatment were "deliberately ignored" at his medical appointment on May 23, 2019; whether he was seen again after May 23, 2019, due to swelling of the wounds; and "in fact[,] plaintiff has never been inflicted with a gunshot wound to the back ever.").

Pursuant to the April 20, 2019, incident, plaintiff was placed in restrictive housing and, after an investigation, convicted of a disciplinary infraction for fighting. Defs.' Stmt. Mat. Facts. [D.E. 72] at ¶¶40–41; Defs.' App., Ex. 1M, [D.E. 73-1] at 110–122; but see Pl.'s Stmt. Mat. Facts [D.E. 80] at ¶40 (querying whether video and reports show he was assaulted, not fighting).

On May 13, 2019, plaintiff both refused to leave the Restrictive Housing Unit and return to regular population when directed to do so by defendant Joyner and refused protective custody. Plaintiff was charged with a disciplinary infraction for disobeying an order. Later, the charge was dismissed. Defs.' Stmt. Mat. Facts. [D.E. 72] at ¶¶42–44; but see Pl.'s Stmt. Mat. Facts [D.E. 80] at ¶¶42–44 (not disputing he refused Joyner's order to return to regular housing, but querying: whether he submitted a request to "speak with a head official of the dangers of plaintiff's well-being by being housed at Maury [C.I.]"; whether he was "denied to speak to a head official by the defendant Joyner to start a protected process [sic]"; and whether the reason for the dismissal of the disciplinary infraction for failure to obey an order was due to his "statement explaining the dangers of his well-being [due to] being housed at Maury [C.I.]"). The record generally supports defendants' statements. See Defs.' App., Ex. 1N, [D.E. 73-1] at 123–25 (June 12, 2019, disciplinary report and hearing record dismissing infraction for May 13, 2019, refusal of Joyner's order); id. at 133 (May 21, 2019, investigating officer's report including, *inter*

*alia*, Lieutenant Hackney's statement that plaintiff "stated he could return to the yard" but "wanted to be shipped and was not in fear of his life," and Joyner's statement that, after Joyner asked plaintiff to return to regular population, plaintiff asked "to speak to a higher official" but "did not want to request protective custody"); see also Def. Joyner's Answers to Pl.'s 1st Set of Interrogatories, [D.E. 48-1] at 45 (responding: on May 13, 2019, Joyner gave plaintiff "a directive to return to regular population, which he refused," and "offered" to place him "on Protective Custody," which he also refused, and Joyner wrote him up "for refusing a directive"; Joyner "advised upper management of [plaintiff's] concerns and also that [plaintiff] had refused Protective Custody"; and plaintiff submitted a DC-138B witness statement as to this write up).

On May 17, 2019, plaintiff was charged with a disciplinary infraction for threatening staff and remained in restrictive housing until he was reassigned to the Green Unit on July 3, 2019. See Defs.' Stmt. Mat. Facts. [D.E. 72] at ¶¶45–46; but see Pl.'s Stmt. Mat. Facts [D.E. 80] at ¶¶45–46 (querying if the disciplinary conviction is relevant to his claims, and whether he was "forced to be housed on Green Unit after remaining on restrictive housing until July 3, 2019").

On July 4, 2019, plaintiff refused reassignment to the Blue Unit A Dorm and was charged with an infraction for disobeying an order, but he elected to go to restrictive housing and the charge was dismissed. See Defs.' Stmt. Mat. Facts. [D.E. 72] at ¶47–48; but see Pl.'s Stmt. Mat. Facts [D.E. 80] at ¶¶47–48 (querying: "whether [he] refused being housed on Blue Unit A-pod" on July 4, 2019, when Roundtree "noticed inmates surrounding plaintiff in chow hall and attempted to reassign the plaintiff back to Blue Unit where he were assaulted two times [sic]"; and whether the reason the infraction was dismissed was a "coverup" of the fact that "plaintiff explained verbally and by DC-138B of the danger of his well-being [sic]"). The record generally supports defendants' statement. See Defs.' App., Ex. 1O, [D.E. 73-1] at 141–43 (July 19, 2019,

11

disciplinary report and hearing record dismissing the July 4, 2019, infraction); id. at 145 (July 4, 2019, Sergeant Brounson witness statement that plaintiff "refused housing on Blue Unit Cell A-16" and "stated [he would] rather be locked up," and was placed on restrictive housing pending investigation); but see id. at 147–48 (plaintiff's July 15, 2019, witness statement both addressing a Green Unit chow hall incident, where Roundtree saw inmates stand up to confront plaintiff, and expressing concern about returning to the Blue Unit where two prior attacks had occurred); Roundtree's Answers to Pl.'s 1st Set of Interrogatories, [D.E. 48-1] at 23 (responding, Rountree generally recalled a July 4, 2018, Green Unit chow hall incident, but not specific details).

On July 12, 2019, Ravenell directed plaintiff to return to regular population. He refused and was charged with disobeying an order, but the charge later was dismissed. Defs.' Stmt. Mat. Facts. [D.E. 72] at ¶¶49–50; but see Pl.'s Stmt. Mat. Facts [D.E. 80] at ¶¶49–50 (querying whether: on July 12, 2019, while in Gray Unit on restrictive housing, he was "forced back on Blue Unit D-Pod . . . when inmates approached Sergeant Outlaw and told her plaintiff [was] a snitch and she should move him[,] or plaintiff would be harmed"; he was "forced to be moved to a different pod on Blue Unit which he refused and requested to be sent to segregation; Roundtree "came to plaintiff's cell door and explain[ed] that she had knowledge of the danger of plaintiff's well-being on any unit at Maury but nothing could be done and plaintiff had to sign refusal of protection form and be returned to regular population," but he refused to sign; Roundtree "then walked away and sent defendant Ravenell to plaintiff's cell door with an order to charge plaintiff with an infraction if he refused to sign the refusal of protection form in which plaintiff refused and defendant Ravenell followed orders"; and whether his disciplinary charge for disobeying was dismissed to "cover up" the fact that "plaintiff stated verbally and by submitting [sic] a DC-138B statement explaining that he in fact were in danger and needed help to prevent attacks").

12

The record generally supports defendants' statements regarding plaintiff's July 12, 2019, refusal of Ravenell's orders. See Defs.' App., Ex. 1P, [D.E. 73-1] at 149 (July 31, 2019, record of hearing dismissing this July 12, 2019, disciplinary offense); id. at 152 (July 24, 2019, offense and disciplinary report noting, on July 12, 2019, Ravenell reports he gave plaintiff a direct order to move to a new housing assignment, but plaintiff refused); id. at 156 (July 14, 2019, investigation report noting, on July 12, 2019, Ravenell ordered plaintiff to move to a new housing assignment, but plaintiff refused); see also id., Ex. 1O, [D.E. 73-1] at 148 (plaintiff's July 15, 2019, statement that he "recently" refused to sign a protective custody form but didn't "refuse to come off" segregation, and was "charged" by Ravenell and Roundtree); but see Def. Roundtree's Answers to Pl.'s 1st Set of Interrogatories, [D.E. 48-1] at 23–24 (responding that Roundtree did not recall whether Roundtree had spoken to plaintiff about the March 22 and April 20, 2019, attacks while in the Gray Unit on July 12, 2019, and, as to plaintiff's query whether Rountree told plaintiff that he had to return to regular population despite his "concerns of being attacked again," responding that plaintiff "refused protective custody and refused directives to return to regular population after being housed on restrictive housing beyond the segregation timeframe"); Def. Ravenell's Answers to Pl.'s 1st Set of Interrogatories, [D.E. 48-1] at 31 (responding affirmatively to plaintiff's queries that, on July 12, 2019: Ravenell received an order from Ravenell's supervisor to serve a "Protective Order Refusal Form" to plaintiff and to order plaintiff to "sign the form and pack his property to return to regular population"; plaintiff refused to sign the "Protective Order Refusal Form"; and Ravenell was ordered by supervisors "to serve a disciplinary [sic] on the plaintiff for refusing to go back to Maury C.I. regular population").

On July 24, 2019, plaintiff was reassigned to the Green Unit. Defs.' Stmt. Mat. Facts. [D.E. 72] at ¶¶51–53; but see Pl.'s Stmt. Mat. Facts [D.E. 80] at ¶¶51–53 (querying whether, on

13

July 24, 2019, he was "forced back into regular population and assigned to Green Unit B-Pod," and whether he was "ordered to return to the same unit (Blue Unit) multiple times by defendants even though plaintiff were [sic] assaulted two times on the same unit after April 20, 2019").

On July 25, 2019, circa 4:40 p.m., plaintiff was involved in an altercation with a different inmate in the Green Unit. About 30 minutes later, he was medically evaluated by a nurse who noted three stab wounds – two to his lower jaw and one to his neck – that were treated with sutures. Plaintiff was assigned to restrictive housing until he was transferred to another facility. Compare Defs.' Stmt. Mat. Facts. [D.E. 72] at ¶¶54–57; with Pl.'s Stmt. Mat. Facts [D.E. 80] at ¶¶54–59 (querying: whether he spoke to Harper requesting to "speak to some head official to be placed on protective custody," Harper stated there is nothing that can be done, and, hours later, plaintiff "was assaulted and stabbed by an inmate in an unauthorized area in a surprise attack"; whether he was evaluated 30 minutes after the altercation and "denied outside medical attention"; whether sutures were used to close the wounds "without knowledge of how deep the wounds were and how much damage [there was] to [his] vocal chords"; whether, after being sent to restrictive housing, plaintiff was "taunted and joked about having knowledge of plaintiff being assaulted again by defendant Hetrick [sic]"; "whether the plaintiff being denied and treated indifferently of being accepted for protective custody by the defendant were applied in good-faith effort to maintain or restore discipline or maliciously and sadistically to cause harm [sic]"; and "whether plaintiff's injuries resulted from his own acts of attempting to refuse housing and verbally as well as submit documentation to speak to a head official of the danger of well-being or from the defendants' purposeful acts of denying plaintiff's pleas for protective custody [sic]"); see also Harper's Answers to Pl.'s 1st Set of Interrogatories, [D.E. 48-1] at 38 (responding, *inter alia*, that, on July 25, 2019, Harper brought plaintiff a grievance procedure response form to

14

sign, but Harper does not recall "any attempt by [plaintiff] to request help from administration or asking to be transferred" from Maury C.I. due to threats to plaintiff's wellbeing); Hetrick's Answers to Pl.'s 1st Set of Interrogatories, [D.E. 48-1] at 14 (responding, *inter alia*, that Hetrick did not recall speaking to plaintiff in the Red Unit C-Pod after the July 25, 2019, altercation).

The July 25, 2019, video, although not especially clear, shows inmates standing in front of Green Unit slider doors, an offender appearing to strike at plaintiff, the attacker walking away circa 4:40:54, an inmate signaling the control room for attention, and the control room officer closing the slider doors. This video generally aligns with the incident report. See Defs.' App., Ex. 1Q [D.E. 73-1] at 159–62 (July 25, 2019, incident report stating, *inter alia*: both Offender Ellis and plaintiff "were close custody, level three bloods assigned to green unit; in an interview, plaintiff "stated that he did not know who had stabbed him but he thought it was because the other offenders had called him a 'snitch' ([plaintiff] was unable to identify which offenders had called him a 'snitch')"; Harper reviewed the video, and stated it showed the attacker, Offender Ellis, walk from Green Unit A-pod into the front of the B-pod and stab plaintiff; that the investigator's review of the video support's Harper's statement; and concluding that "the staff involved in this incident did carry out their duties in accordance with established procedure").

Contemporaneous medical records support defendants' statements about plaintiff's medical treatment after the July 25, 2019, incident. See Defs.' App., Ex. 1C, [D.E. 73-1] at 35–36 (July 25, 2019, nurse clinical encounter at 5:17 p.m. reflecting: as chief complaint, "altercation/fight"; as subjective complaint, "Inmate was assaulted on his housing unit. He suffered three stab wounds, two to his right lower jaw and one to his anterior neck. All wounds appeared to be superficial but moderately bled"; "refer to provider"; and, as to "disposition," "Provider saw inmate in main medical and placed 7 sutures in wounds"); id. at 37–40 (July 25,

15

2019, 5:19 p.m. physician clinical encounter noting: as subjective complaint, "35 y/o male seen in the clinic after being assaulted – sustained some superficial cuts in the submandibular area and upper anterior neck. Notes some discomfort on swallowing"; on exam, "skin/submandibular area – 2 superficial lacerations --- about 4cm each. Neck – skin – upper anterior laceration – about 4cm"; assessing multiple acute lacerations; as "procedures," "3 lacerations repaired with #4 sutures --- total of 9 sutures applied to the 3 laceration sites . . . Tolerated the procedure well"; as to "disposition," follow-up at sick call as needed; and ordering removal of sutures in 10 days); id. at 41–42 (July 25, 2019, 10:51 p.m. nurse clinical encounter reflecting: as "chief complaint," "inmate declared medical emergency with chief complaint of difficulty swallowing. He was seen by provider approximately 2 hours ago [status post] three stab wounds to the right lower jaw and neck. Wounds were superficial but did require sutures. Inmate states that it hurts to swallow. He has voiced this complaint to provider when seen two hours ago, and the provider has ordered mouthwash with lidocaine for this problem"; as "assessment," "coping, ineffective"; as to "disposition," "follow-up at sick call as needed; and, as "other," "patient in no apparent distress. He needed reassuring that as the lidocaine wears off surrounding his stab wounds, he will have a pulling and slightly painful sensation when swallowing. Vital signs good").

Legal Standard:

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The moving party initially must demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving

16

party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A court reviewing a motion for summary judgment should determine if a genuine issue of material fact exists for trial. Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007).

Discussion:

"In order to make out a *prima facie* case that prison conditions violate the Eighth Amendment, a plaintiff must show both (1) a serious deprivation of a basic human need; and (2) deliberate indifference to prison conditions on the part of prison officials." Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993) (quotation omitted). The first prong requires that "the deprivation of [a] basic human need was objectively sufficiently serious." Id. (quotation and emphasis omitted). The second prong requires a showing that "the officials acted with a sufficiently culpable state of mind." Id. (quotation and emphasis omitted); see Farmer v. Brennan, 511 U.S. 825, 835 (1994) ("[D]eliberate indifference entails something more than mere negligence [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.").

Although prison officials have a duty "to protect prisoners from violence at the hands of other prisoners," Farmer, 511 U.S. at 833 (citation and quotation marks omitted), an official will not be liable for a failure to protect an inmate "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the

17

inference." Id. at 837. Failure to alleviate a significant risk of harm that an official "should have perceived but did not" also does not violate a plaintiff's constitutional rights. Id. at 838. In short, a plaintiff must show: (1) he was incarcerated under conditions posing a substantial risk of serious harm; (2) the official was deliberately indifferent to that substantial risk to his health and safety; and (3) the official's deliberate indifference caused the harm. See id. at 834.

The doctrine of *respondeat superior* generally does not apply to a § 1983 action. See Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009); Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691–92 (1978). Rather, for a cognizable supervisory liability claim, "[a] plaintiff must show actual or constructive knowledge of a risk of constitutional injury, deliberate indifference to that risk, and 'an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.'" Carter v. Morris, 164 F.3d 215, 221 (4th Cir. 1999) (quoting Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994)), abrogated on other grounds by Wilkins v. Gaddy, 559 U.S. 34 (2010) (per curiam); see King v. Riley, 76 F.4th 259, 269 (4th Cir. 2023).

Here, defendant Harper declares, *inter alia*: Harper then was a Maury C.I. Unit Manager and had "some authority to control which dorm or cell within [his] unit inmates are housed"; however, "if an inmate is assigned to [his] unit, [Harper does] not have authority to unilaterally move him to another unit or facility" which "would require authority from [his] supervisors"; if an inmate told Harper that "he feared for his life or safety due to a specific threat, [Harper] would have ensured that he was placed in restrictive housing pending a protective custody investigation"; "many times, inmates complain about their housing assignment due to some unspecified threat, without identifying the person or group of people who are threatening the inmate" and, "in those situations, we cannot complete a protective custody investigation because we do not know who the inmates need protection from"; "if an inmate were in restrictive housing

18

after being assaulted by other inmates, but refused protective custody, we would [have] no other option but to release the inmate back to regular population because we cannot keep inmates in restrictive housing without control status (RHCP, RHAP, RHDP, PCON). Normally, under those circumstances, the inmate would be reassigned to a different dorm than the one where he was assaulted"; at Maury C.I., the Blue Unit has six separate and distinct Dorms with A, B, and C on one side and D, E, and F on the other side of the facility; inmates in one Blue Unit dorm do not have direct contact with inmates in other Blue Unit dorms, and they do not have chow hall or recreation together; plaintiff never expressed to Harper any specific concerns for his safety and, if he had, "a protective custody investigation would have been initiated"; and, even were plaintiff assaulted in one dorm of the Blue Unit, his assignment to other Blue Unit dorms "would not have been problematic because he would not have had direct contact with any of his alleged attackers." See Defs.' App., Ex. 2, Harper Decl., [D.E. 73-2] at 1–3.

Defendant Roundtree declares, *inter alia*: at the time, Roundtree was a Maury C.I. Unit Manager; prior to March 22, 2019, "plaintiff never voiced any concerns for his safety"; at the time of the March 22, 2019, incident, Roundtree was not present in the unit; "When an inmate is in restrictive housing for a physical altercation with another inmate, but refuses protective custody and refuses to cooperate in the investigation, there is not much that correctional staff can do to assist the inmate" because "we cannot allow him to stay in restrictive housing without being on some type of control status (RHAP, RHDP, RHCP, PCON)"; "Sometimes inmates will refuse protective custody and refuse to go back to regular population, and staff are forced to issue them a B25 disciplinary infraction for Disobey Order" which "will give them a control status (RHAP) until their infraction is resolved, and through any disciplinary sentence (RHDP)"; in this case, plaintiff "refused protective custody and refused to return to regular population" and

19

"was issued a B25 (Disobey Order) disciplinary infraction, but that [infraction] was dismissed after Plaintiff agreed to return to regular population"; because of his issues with Blue Unit, F Dorm, "plaintiff was assigned to a different dorm (Blue Unit, C Dorm) upon his release from restrictive housing" on April 4, 2019; after his April 20, 2019, altercation, plaintiff again was assigned to restrictive housing pending an investigation, he "again refused protective custody, and refused to return to regular population," and "was again charged with a B25 disciplinary infraction, which was dismissed when Plaintiff agreed to return to regular population"; upon his release from restrictive housing, plaintiff was reassigned to a different dorm (Green Unit, B Dorm); "In July 2019, Plaintiff refused an order to move to Blue Unit, A Dorm, and was charged with a B25 disciplinary infraction, which was again dismissed when Plaintiff agreed to return to regular population"; although plaintiff claims that Roundtree "was the one who ordered that Plaintiff be moved from Green Unit to Blue Unit because of some alleged incident in the chow hall," had Roundtree "seen an incident that made [Rountree] think that Plaintiff's safety was in jeopardy," Roundtree "would have sent [plaintiff] to restrictive housing (not moved him to a different unit)"; regardless, the ultimate result was the same because plaintiff refused the order to go from Green Unit to Blue Unit and he was taken to restrictive housing, pending an investigation; "Upon release from restrictive housing, Plaintiff was assigned to Green Unit, B Dorm, where he got into another physical altercation with yet another inmate"; and, "Based on the totality of the circumstances, it is [Roundtree's] belief that Plaintiff simply did not like Maury CI, and was attempting to manipulate staff into transferring him to a different facility." See id., Ex. 3, Roundtree (a.k.a. Reggielette Coley) Decl., [D.E. 73-3] at 1–4.

Defendant Hutchinson declares, *inter alia*: Hutchinson then was a Maury C.I. Sergeant; except taking an inmate to restrictive housing, Hutchinson did not have the authority to reassign

20

an inmate from one unit to another or to transfer him to another facility; if an inmate were to tell Hutchinson that "he feared for his life or safety due to a specific threat, [Hutchinson] would have ensured that he was placed in restrictive housing pending a protective custody investigation"; "many times, inmates complain about their housing assignment due to some unspecified threat, without identifying the person or group of people who are threatening the inmate" and, "in those situations, we cannot complete a protective custody investigation because we do not know who the inmates need protection from"; neither plaintiff nor other inmates ever told Hutchinson it was not a good idea to have plaintiff in the Blue Unit due to rumors that plaintiff had snitched on other inmates and something would happen to plaintiff if he was not reassigned to another pod on a different unit; Hutchinson never said that plaintiff would have to take care of the issue on his own; Hutchinson does not recall making a decision to move plaintiff to C-Pod due to threats in B-Pod or telling Hetrick that; plaintiff could have been moved for "a number of reasons" and, even if plaintiff was "moved to another dorm because he was having problems with the inmates in his dorm, that should alleviate the problem because inmates in one dorm do not have direct contact with inmates in other dorms"; plaintiff never expressed to [Hutchinson] any specific concerns for his safety"; and, had plaintiff expressed such concerns, "a protective custody investigation would have been initiated." See Kennard Hutchinson Decl., [D.E. 77] at 1–4.

Defendant Hetrick declares, *inter alia*: Hetrick then was a Maury C.I. Sergeant; except taking an inmate to restrictive housing, Hetrick did not have the authority to reassign an inmate from one unit to the other or to transfer an inmate to another facility; "if an inmate came to [Hetrick] and voiced concerns for his safety, [Hetrick] would have either taken them to see the OIC [Officer In Charge] or had them fill out a protective custody form"; "Plaintiff never expressed to [Hetrick] any concerns for his safety"; if plaintiff had stated to Hetrick that he

21

feared for his safety, Hetrick "would have placed him into restrictive housing, pending a protective custody investigation"; and Hetrick did not have responsibility for the medical care of any inmate. See Defs.' App., Ex. 5, Hetrick Decl., [D.E. 73-5] at 1–2.

Defendant Herring declares, *inter alia*: Herring then was the Maury C.I. Warden; because Herring lacks the necessary information, Herring does not respond to inmate correspondences "most of the time," but refers them "to the appropriate person with the necessary information" to allow that person to respond; Herring does not recall ever receiving any correspondence from plaintiff regarding plaintiff's safety; even if Herring had received such a correspondence, Herring would have referred it for someone else to investigate and respond; after being sued in this matter, Herring's personal investigation revealed, *inter alia*, that plaintiff had been assaulted by members of his own gang in 2012 "because he refused to flip gang sets," and that the altercation in March 2019 also involved members of plaintiff's gang; after being assaulted at Maury C.I., plaintiff "continuously refused protective custody" and instead "just wanted a transfer to another facility"; and Herring believes that plaintiff "was attempting to manipulate himself into the unit and/or facility of his choice." Id., Ex. 6, Herring Decl., [D.E. 73-6] at 1–2.

Defendant Dudley declares, *inter alia*: Dudley was then an Assistant Unit Manager at Maury C.I.; if any inmate approached Dudley and told Dudley that he feared for his life or safety due to a specific threat, Dudley would have ensured that he was placed in restrictive housing pending a protective custody investigation; "many times, inmates complain about their housing assignment due to some unspecified treat, without identifying the person or group of people who are threatening the inmate" and, "in those situations, we cannot complete a protective custody investigation because we do not know who the inmate needs protection from"; "[i]f the protective custody investigations cannot be completed, or is completed and does not result in an

22

assignment to protective custody, the inmate is released back to regular population because an inmate cannot be in restrictive housing without a control status (RHCP, RHAP, RHDP, PCON)"; although he claims Dudley "was somehow responsible for him getting assaulted," plaintiff never expressed any specific concerns for his safety to Dudley; if plaintiff had done so, a protective custody investigation would have been initiated. Id., Ex. 7, Dudley Decl., [D.E. 73-6] at 1–2.

Defendant Joyner declares, *inter alia*: Joyner then was a Maury C.I. Sergeant; "if an inmate came to [Joyner] and voiced concerns for his safety, [Joyner] would have either taken them to see the [Officer In Charge] or had them fill out a protective custody form"; except taking an inmate to restrictive housing, Joyner did not have the authority to reassign an inmate from one unit to the other or to transfer an inmate to another facility; Joyner understands that plaintiff claims Joyner "was somehow responsible for getting him assaulted on July 25, 2019[,] because he claims [Joyner] somehow forced him back into regular population"; on May 13, 2019, Joyner gave plaintiff an order to return to regular population but plaintiff refused that order and "also refused protective custody"; because an inmate cannot be in restrictive housing when the inmate "is not on some type of control status (RHAP, RHCP, RHDP, PCON)," Joyner issued plaintiff a B25 disciplinary infraction for Disobey Order; plaintiff did ask to speak with a higher official and Joyner "relayed his request to [Joyner's] supervisor"; "Regardless, by issuing [plaintiff] the disciplinary infraction, [Joyner] essentially gave [plaintiff] what he wanted – to stay in restrictive housing"; and "plaintiff could have stayed in restrictive housing for longer had he desired, but he eventually elected to go back to regular population." Id., Ex. 8, Joyner Decl., [D.E. 73-8] at 1–2.

Defendant Ravenell declares, *inter alia*: Ravenell was a Maury C.I. Corrections Officer; except taking an inmate to restrictive housing, Ravenell did not have the authority to reassign an inmate from one unit to another or transfer an inmate to another facility; although plaintiff claims

23

Ravenell "was somehow responsible for him getting assaulted," he "never expressed any concern for his safety"; if plaintiff had stated to Ravenell that he feared for his safety, Ravenell "would have placed him into restrictive housing pending a protective custody investigation"; if plaintiff refused protective custody, "there would be little that [Ravenell] could do because we are not allowed to leave inmates in restrictive housing without some kind of control status (RHCP, RHAP, RHDP, PCON)"; and, on July 12, 2019, Ravenell was instructed to move plaintiff from restrictive housing to regular population but he refused and "was subsequently charged with a B25 disciplinary infraction for Disobey Order." Id., Ex. 9, Ravenell Decl., [D.E. 73-9] at 1–2.

Defendant Coley declares, *inter alia*: Coley was then the Maury C.I. Security Risk Group Officer; Coley did not have the authority to reassign an inmate from one unit to the other or to transfer an inmate to another facility; Coley understands that plaintiff alleged that, "on March 22, 2019[, plaintiff] told [Coley] 'that plaintiff attempted to inform [Roundtree] of the past incidents that occurred between Plaintiff and the attackers['] associates[,] but [Roundtree] didn't listen to [plaintiff's request] to be assigned to another pod or unit,'" and plaintiff advised Coley that he "should be transferred due to the circumstances," but Coley does not recall plaintiff ever telling Coley that; "even if such a conversation occurred, the most [Coley] could have done at the time would have been to place Plaintiff in restrictive housing pending a Protective Custody investigation"; and it is Coley's "understanding that Plaintiff was already in restrictive housing when this conversation allegedly occurred" such that "there would have been nothing more that [Coley] could have done." Id., Ex. 10, Larry Coley Decl., [D.E. 73-10] at 1–2.

All defendants declare: plaintiff was "just another inmate" to them; they hold no feelings of ill will toward him; they never wanted to harm him; and they were merely performing their job duties. See id., Ex. 2, Harper Decl., [D.E. 73-2] at ¶10; Id., Ex. 3, Roundtree (a.k.a.

24

"Reggielette Coley") Decl., [D.E. 73-3] at ¶13; id., Ex. 5, Hetrick Decl., [D.E. 73-5] at ¶7; Id., Ex. 6, Herring Decl., [D.E. 73-6] at ¶6; Id., Ex. 7, Dudley Decl., [D.E. 73-6] at ¶6; Id., Ex. 8, Joyner Decl., [D.E. 73-8] at ¶7; Id., Ex. 9, Ravenell Decl., [D.E. 73-9] at ¶6; Id., Ex. 10, Larry Coley Decl., [D.E. 73-10] at ¶6; Hutchinson Decl., [D.E. 77] at ¶9.

As noted above, the complaint is unverified, cf. Goodman v. Diggs, 986 F.3d 493, 498 (4th Cir. 2021), and plaintiff did not file affidavits or declarations in opposition to the motion for summary judgment despite receiving adequate notice under Roseboro and having an opportunity to do so, see Celotex, 477 U.S. at 324; cf. Pledger v. Lynch, 5 F.4th 511, 525–27 (4th Cir. 2021).

Plaintiff relies upon the allegations in his unverified complaint, his opposing statement of facts – which, although sworn, is comprised entirely of "whether" queries, see Pl.'s Stmt. Mat. Facts [D.E. 80], citations to exhibits, and prison grievances. Plaintiff, however, does not dispute defendants' paramount declarations – that they did not hold ill will toward plaintiff or wish him harm, and each would have placed plaintiff in restrictive housing pending a protective custody investigation, but he eschewed protective custody – or adduce evidence sufficient to support an inference that defendants were personally aware of specific threats of harm to plaintiff before the March 22, April 20, and July 25, 2019, attacks by fellow inmates. See King, 76 F.4th at 266 & n.7 (noting a "known and substantial" risk of inmate-on-inmate violence "must be more specific than 'the general risks that all the inmates posed to one another and prison officials.'" (citation omitted)); see Anderson, 477 U.S. at 252 (noting the "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent the entry of summary judgment); Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003) (noting, "neither '[u]nsupported speculation,' nor evidence that is 'merely colorable' or 'not significantly probative,' will suffice to defeat a motion for summary judgment" (internal citations omitted));

25

see also Nolen v. Goord, 218 F. App'x 41, 43 (2d Cir. 2007) ("assuming defendants had knowledge of the general 'risk factors' enumerated by plaintiff, plaintiff has presented no evidence to show that the outstanding offer of voluntary protective custody made by DOCS officials approximately three months before the assault was an unreasonable response to the risk presented" (citation omitted)); Rider v. Werholtz, 548 F. Supp. 2d 1188, 1198 (D. Kan. 2008) ("Even where the defendants actually knew of a substantial risk of serious harm to the plaintiff, an 'offer of protective custody' 'tends to refute a claim that prison staff acted with deliberate indifference to any such risk.' . . . Accordingly, courts have dismissed or affirmed dismissals of Eighth Amendment failure to protect claims based upon inmates' declined offers of protective custody." (internal citation omitted and collecting cases)); Hall v. Arnold, No. CIV.A. 07-202-JMH, 2007 WL 3399745, at *4 (E.D. Ky. Nov. 13, 2007) ("Prison officials are not required to guarantee a prisoner's safety under terms and conditions dictated by the prisoner. A prisoner is entitled to adequate protection from harm, but is not entitled to direct prison officials on the means to accomplish it. Having repeatedly refused to accept reasonable means of protecting herself through Protective Custody, [plaintiff] cannot now seek to hold prison officials liable for harm to herself that she could reasonably foresee in light of her refusal." (citations omitted)).

In sum, plaintiff fails to show that defendants knew of, but disregarded, a substantial risk of serious harm, Farmer, 511 U.S. at 837, recognized their "actions were insufficient to mitigate the risk of harm," Iko, 535 F.3d at 241 (quotation marks and citation omitted), or acted with the requisite culpable state of mind, Strickler, 989 F.2d at 1379; King, 76 F.4th at 269 ("At summary judgment, a plaintiff must identify evidence that each individual defendant acted (or failed to act) with a culpable state of mind." (citation omitted)). Plaintiff also fails to show that defendants'

deliberate indifference caused the harm, cf. Farmer, 511 U.S. at 834, or that a supervisory liability claim lies against defendants under the governing standard, see Shaw, 13 F.3d at 799.

Because plaintiff demonstrates, at most, defendants' mere negligence as to these attacks by fellow inmates, the danger of which defendants "should have perceived but did not," Farmer, 511 U.S. at 838, he fails to satisfy the subjective component of an Eighth Amendment claim, see Davidson v. Cannon, 474 U.S. 344, 347–48 (1986) (holding a negligent failure to protect a prisoner from another inmate cannot support a § 1983 claim); Ruefly v. Landon, 825 F.2d 792, 793 (4th Cir. 1987) ("Mere negligent conduct on the part of prison officials who fail to protect a prisoner from a risk of harm posed by fellow inmates does not constitute a violation of the [Eighth Amendment's] prohibition against cruel and unusual punishment."); see also Whitley, 475 U.S. at 319 (noting it is "obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause.").

After considering the record and the reasonable inferences drawn therefrom in the light most favorable to plaintiff, Scott, 550 U.S. at 378, defendants have met their burden of demonstrating the absence of evidence to support plaintiff's failure-to-protect claims, Celotex, 477 U.S. at 325, but plaintiff fails to "come forward with specific facts showing that there is a genuine issue for trial," Matsushita, 475 U.S. at 587 (emphasis and quotation omitted). Accordingly, defendants are entitled to summary judgment. Anderson, 477 U.S. at 249.

Alternatively, as government officials, defendants are entitled to qualified immunity from civil damages when their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In other words, defendants are entitled to qualified immunity when (1) plaintiff has not demonstrated a violation of a constitutional right, or (2) the court concludes the right at issue

27

was not clearly established at the time of the official's alleged misconduct. <u>Pearson v. Callahan</u>, 555 U.S. 223, 236 (2009). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 741 (2011) (alterations and quotations omitted).

Here, reasonable corrections officers in defendants' positions would not have recognized that their actions – purportedly failing to protect plaintiff via transfer to specific dormitories to avoid prospective inmate-on-inmate violence despite not being personally aware of particularized threats of harm and plaintiff eschewing protective custody – violated plaintiff's clearly established rights. <u>See id.</u> at 743 ("When properly applied, [qualified immunity] protects 'all but the plainly incompetent or those who knowingly violate the law.'" (citation omitted)); <u>King</u>, 76 F.4th at 266 ("[E]ven if the risk of inmate violence was substantial and [defendant] knew that—[plaintiff] needs precedent establishing that [defendant's] efforts to mitigate that . . . were constitutionally deficient."). Thus, defendants also are entitled to qualified immunity.

Conclusion:

In sum, the court GRANTS defendants' motion for summary judgment [D.E. 70]. The clerk shall close the case.

SO ORDERED this 18th day of June, 2024.

Richard E Myers II
RICHARD E. MYERS II
Chief United States District Judge

28